Case No. 16-7113, Z. B., a minor, by her parents and ex-friends, at El Atalan, v. District of Columbia, a municipal corporation. Mr. Ike, for the Atalan. Mr. Love, for the athlete. Good morning, and may it please the Court, I am Michael Ike, on behalf of Z. B. and her parents. In other words, we respectfully submit that the District Court committed a multitude of errors, both factual and legal, in reaching its incorrect decision in this matter. Of greater significance are, the Court employed a doubly erroneous standard in holding for the school system. First, of course, it did not employ the standard for determining a free or appropriate public education that the Supreme Court has now announced in the Andrew F. case. The question should be, what might did Andrew F. share? I mean, it established some language that, probably, didn't count. But, it seems to me that a certain amorphous quality in the standard set forth, if you recall the standard, set forth in Andrew F. Then, that's kind of cut back when he talks about things that are not a reasonable prospect for a child, if it's progress. If he is progress, it's not a reasonable prospect. I.e. he may not aim for great wealth. One thing that seems very clear is that it sets forth a very fact and context specific notion. Judge, if I may, treading water is not enough, except in cases where treading water would be enough. What the court, what the Chief Justice says in Andrew F. is that the standard that the court is announcing is, using the Chief Justice's own words, a markedly more demanding standard than the way Rowley had been interpreted in the Tenth Circuit and in the D.C. Circuit and in most circuits. The standard was interpreted here as basically a basic floor of opportunity, which a number of circuits have equated, and actually the petition for cert in Andrew F. equated to the more than minimal progress in Andrew F. The difference, as applies to this case, and I believe to many cases, is that what it focuses on is progress. What the court says in Andrew F. is that an IEP is supposed to be engineered, the whole purpose of special education is to make progress. But the district court here and the hearing officer here did not condemn ZB to zero progress by any means. Zero progress is, that's the problem with the standard. To begin with, what the district... In fact, they thought more than minimal progress. Is there any dispute about that? That she had made more than minimal progress? They thought to, by writing the IEP... She had made more than, I'm sorry. They thought, in putting the terms of the IEP in according to the evaluation, they thought to assure that she would make more than minimal progress. They thought to ensure, the record is, according to the expert testimony presented by the parents, that she wouldn't have made significant progress, is the word that they used a number of times. But, I am not arguing that... It's a very rare case where you would argue that a student would not make minimal progress. That's the reason that we needed Andrew F. in order to clarify that that wasn't the right standard. And in fact, what the Supreme Court said, as far as making minimal progress, it is equivalent to just letting the student be promoted from year to year until they drop out. That's the words of the Chief Justice. But that doesn't seem to be what's going on here. They set up an IEP and there was no opportunity for Hearst to show whether there would or wouldn't have been progress under the IEP. And every time... And in fact, the parents did not object to the IEP in June as inadequate, did they? There's nothing in the record saying that they objected. The parents were not rejected. No. The parents were not rejected for the summer. No. And in fact, in the summer, they said we're going to private school. They didn't say the IEP is inadequate in these various ways and therefore we're going to private school. The parents said that, according to Z.B.'s father, what the parents said is that they had decided that they had to go to the lab school in order for their daughter to get an appropriate education. He never said that we specifically reject the IEP because she hasn't made minimal progress. He wasn't represented by counsel. He wasn't represented by an advocate. Well, and also there was only four days of the school year in which progress could have been demonstrated. So that was... So you do have to look at it somewhat more in the abstract. And I understand that there are going to be cases where even, you know, the parents don't have to take chances with their child. Nonetheless, what we end up with really is a battle of the experts in the abstract. No? Because we haven't had a situation in which the school either refused or failed to timely put an IEP in place. When asked, they put one in place. And they put it in place and the parents objected to no term of that IEP at any time before they withdrew their daughter. Is that right? That is not... No, Your Honor. They did question. They wanted more service for their daughter. They did not reject the IEP. No, they didn't identify any defect in the IEP. Where in the record did they object after they had the IEP in front? They signed the IEP. I'm sorry. Before the... What I'm referring to is in the summer. I'm sorry. What I'm referring to is when Z.B.'s father went to the school to withdraw his daughter and to serve notice. That seems to... That is nowhere in the record because of the IEP. Okay. No, but I think... I thought you were saying that they... Maybe I misunderstood you. I thought you were saying in response to Judge Pillard that they were presented with the June 2014 IEP, signed it, that they... They did reject it. That's correct. I don't want to play words here. I get that they didn't reject it, but I thought you were saying while they didn't reject it, they still expressed concerns about it. Where in the record are those concerns about the IEP after it was presented to them? Mr. Z.B.'s father testified about his concerns that he shared. There's nowhere in the record, to my recollection right now, that he said those during that IEP meeting. Doesn't have to be during the meeting. I'm sorry. Any time between receipt of the IEP and I think it was August when they said we're taking her to... No, there's nothing in the record to that. There's nothing at all objecting to the IEP. Nothing. There's no communication at all. Any aspect. And then in August when they said we're taking her to the lab school, were there any specific objections to the IEP then other than in general? In general, we're withdrawing our daughter because we feel that she has to go to the lab school. That's what the parents did. The district didn't raise as an issue of notice. They didn't have notice, but it's absolutely correct that the specific issues that we litigated in the hearing were not presented until after that. So why isn't that a problem for your theory that you can have your IEP, you can sign off? You know, silence is going to be... These things go back and forth. And silence is going to be interpreted as these parents have been actively advocating for the child. You have to be commended for that. But one would expect that if they thought they needed more, you have the whole summer now to go, wait, no, we need more. Let's get that functional behavioral test. Let's get this other thing. We think we need this other thing before school starts and have that back and forth, but they didn't. I would suggest that the worst consequence to the parents would be that, therefore, they might be restricted from receiving tuition reimbursement should they be found to have made the appropriate move for that first semester because by January of 2015, when they returned from the second IEP meeting, not only had they submitted Dr. Stanton's report from outside, which had been there before, but also the information from lab school as to what the child needed. And that IEP still provided for approximately 11 hours a week of special education, some in the mainstream and some self-contained, and that was woefully inadequate. So the district responded, though. I mean, we can't expect them to respond within seconds. They responded with the 2015 IEP, which, since it gave everything they were asking for other than full-time education at the lab school. Absolutely not, Your Honor. The testimony that was either ignored or discounted by the district court was that that IEP lacked appropriate... Are you talking about the 2014 or 2015? 2015, I'm sorry. Okay. ...goals in all basic academics, reading, math, written language, executive functioning, classroom behavior. I'm sorry. It lacked what? It lacked goals? It lacked appropriate goals, not just service hours, which I'll set to the side here, but goals in reading, written language, mathematics, executive functioning, and classroom behavior. They added an April executive functioning. They added everything that she was getting in lab school, and I guess even more because she wasn't getting occupational therapy at lab school. And so... The parents couldn't afford it. Sorry? The parents couldn't afford it is what... I get it now. But there's testimony from Dr. Sands and from Dr. Durham, who was the division head at the lab school, both that the IEP was missing all those pieces in January, not just the original IEP. Right. And then the school then responded. The district then responded and put those things in. Not in January. Okay. When did they put them in? They didn't put them in for that entire school year. They had executive functioning in April, and I think they had... April of the year... I'm sorry. They didn't have...  Well, no. No. No, I'm sorry. Yeah, I'm sorry. Three-quarters of the year is over. And Dr. Sands, who had done the psychological report before the year began, said that she had identified executive functioning needs in the report that the school system had. Which is why, over the summer, the parents could have said, wait, Dr. Sands said, in response to the 2014 IEP... The school system had the report. I mean, the parents were... But they had behavioral elements in the June 2014 one. And so if the parents thought those were not enough, shouldn't they have said, thanks, but not good enough? It would make this argument easier for me right now, but the fact is that we can only expect so much of parents who go outside because of their concerns about how their daughter is doing, get this neuropsychological report, submit it to the school system, and then eventually come to a due process hearing where the same evaluator said, yeah, I identified all that stuff as to what she needed, in addition to much more special education, and I feel that the IEP needs it. That's what the text was. This is not the way you briefed it, but is your argument that as of June 2014, the school, under its responsibility unilaterally, not prompted by parents, really had an obligation to hire better evaluators and develop a much more robust IEP than it did? Yes, and you're right. We didn't argue it that way, but we argued it from the other way around. The difficulty is it can't be that hindsight can impugn the IEP. The IEP is written based on the information at the time, and so either there's something that was known to the school and the parents that wasn't taken account of, and in that view, well, it's a little bit problematic that the parents signed off on it, or, and this seems plausible also, there's a concern of obligation on the school to really, you know, get to the bottom of it on its own initiative, and it becomes apparent to the parents much later that the school hasn't done that, but the fact that without any such obligation, and I haven't seen Hazelot spelling that out, without any such obligation on the part of the school, you really can't say, well, look what happened many months later. The school should have anticipated that. It's hindsight. The way we argued it, Your Honor, I fully agree that, you know, there is a child-finding obligation, of course, in the law, and that requires the school system to identify their professionals. They're the ones we give the benefit of the doubt, and usually there's a dispute. The way we argued is that within, when the, after the parents went outside and got the neuropsychological report, which the evaluator said was not reflected in the IEPs that the school system had proposed, what the parents did is made the decision to go to Lascaux, and the IEP was in June, and within half a year, six months, from the school system's IEP, there was all of this information that showed that the school system should have known this. It was knowing, of course, what a reason we suggest that ZB somehow got all of these needs, compared to come June and December of 2014. That's a difficult question. I mean, people do, children do manifest needs over time, very much. I mean, you know that as well as anyone, that children are developing quickly. Their abilities either shoot forward or fall, you know, fall back relative to their peers. And, you know, this is five years into her experience at Hearst, and this is identified presumably because the needs are becoming rather more apparent. Can I take one example from the record? Judge, that shows that that isn't, of course, children do develop needs as time goes by. This is a very short period of time. But if I just take reading, which is obviously very important for any student, that was identified both when she got to Lascaux, and it was also identified in Dr. Sands' neuropsychological report before. On cross-examination, too, Ms. Oliveros and the school system's psychologist, Ms. Tick, both acknowledged that there were signs on cross-examination that this child was below average for the whole prior year in reading and that they just didn't pick up on it. At least the grades showed that she was improving. And then she could credit the grades. She was moving up from the lowest possible level to the next level. That was a great show, and then the information that Lascaux gets when they put her in their program in September of that year shows that her levels had not moved in any significant way in these basic academic areas. I'm sorry, had not moved. Had not improved the way that her grades, that was the point. I'm sorry, what were the before and after the Lascaux was using? The Lascaux IEP has instructional levels for all basic academics. IEPs need that kind of information. It shows reasonable levels. I'm sorry, I didn't know that. That's consistent with the third grade report, but it is also consistent with the third grade report's show of progress. Well, you may discredit that. I respectfully question it because if indeed her functional levels, as measured by the Lascaux in September right at the beginning of the next year, are that low, then one does have to question the significance of her progress. There was a record just that there was progress between, I could be misremembering here, between the second and third quarters, but we didn't yet have the fourth quarter results. We did not have the fourth quarter. And then did the fourth quarter results show that continued progress or did it show backwards? I guess I sort of got the assumption that things didn't go as well. My recollection, I don't want to misstate, but we relied on hearing as to how she was in September and October of this next year, and those levels were consistently low and consistent with how she had been the prior year is the point. So I don't know. Okay, so the record on reading shows that in the evaluation, she scored in the average range. SAM's report doesn't isolate reading as an area of concern. It identifies language skills as one of ZB's strengths. DCPS staff, who are also educational experts, and I understand you don't always want to credit when they come out, they say that she didn't show a need for reading as this is at the time the June 2014 IEP was drafted. Getting back to your prior question, Your Honor, you said, and it was partially correct with all due respect, that IEPs do have to be judged based upon the information that was known or should have been known is what the courts have said, which makes sense, of course. And what's important in this situation is if indeed she was as we have two other facts there. One, the fact that we have this information from the early fall as to her having significant needs in a number of these academic areas, and two, if indeed the school system witnesses during the hearing note that, yes, there were reading problems. They did note that. They just hadn't picked up on it. That's simple. That could happen, of course, and that's what they acknowledged. Reading problems during 2014? Yes. I'm sorry, yes. During the process. During 2014. And just tell me where you're looking in the record for that. If I can, I reserve two minutes. Oh, don't worry. Don't worry about the time. Okay. No, no, I'm just saying that to find that in the record. So here's a, are you trying to find the? To find where Ms. Tick and Ms. Olivera's. I remember where it's in my brief, but I want to check that obviously. Okay. Is it Ms. Tick and Olivera's who you said showed reading lagging, said that there was reading lagging in the 2013 to 2014 school year? Yes. Well, at least in our brief, our original brief at page 32, we say Ms. Olivera, the DCPS special educator, confirmed that DCPS should have understood that Dr. Sam's report showed DB's needs in reading. She testified that Dr. Sam's recommended special education in language art was encompassed reading, and that's a joint statement. Should have understood that Dr. Sam's report showed needs. But that's a report that wasn't made until after the end of that school year, right? Yes, but I'm not finished. Okay. That's a 373, by the way. But then she said that DB performed similarly poorly in reading and math. That's a 375. And that DB's special education eligibility was based in part upon her reading and writing deficit, and that's a JA 374. And I'm looking for, and above that. I don't have a JA 374. Are we using your base? I'm confused. Is it the base stamps? Is it the middle number or is it the base stamp number? Because it's not working for me. We're going to do a question. This is a question. I can't. Is it, does it have the big bold number or is it the base stamp number? The bottom, yes. Information. 375. Sorry. Is it 375? Yes. Okay. We're going to work on your numbering system here. Just, we'll give you a moment. Thank you. We agreed to an amended seal appendix. I'm looking at the original appendix supplement under seal. So if I can correct those, which obviously I can't do standing right here. Okay. I don't know how that happened. Obviously. I apologize. No. The pages are going to be there. I just have to give you different types because we didn't change the page. Obviously, we didn't change the appendix. Does the record show when they applied to lab school? I know that they said they were going to have an audit. I believe it was in the spring. It's a hard school to get into. It is a hard school to get into. So they were already applying to lab school in the spring before the June IEP came out? Yes. I'm sorry, Judge. I'm looking at it. I'll get the right page. Page 32 of our corrected brief that I was referring to before that had, I just have to get you the joint appendix. I did want to point out that Ms. Tick, as well, and that's the top of page 32, noted that Sarah Tick admitted that D.B. had performed not well on her third grade report prior to her reading, as Judge Williams pointed out. More specifically, Ms. Tick admitted that D.B. was below grade level in reading during the entire 13-14 year, just as she was in math. And the joint appendix cites that. Those joint appendix should be right. What I was referring to from my book. Or the wrong appendix. I'm looking at it. I'm sorry. And so your view is that given that her reading was below average during the 2013-2014 school year, that that should have alerted the school, at least in the process of doing an IEP, triggered by other information about deficits, that they should have given her services in that area? Along with Dr. Sam's report. Dr. Sam's report comes later. And I understand you're acting as if Dr. Sam's report, because it's either information known or that reasonably should have been known, and you're saying, well, because it reasonably should have been known, then we're going to treat it as if it was known. It wasn't known, though. And the question is we've got to consider a school. I mean, half the kids in any class are below average in their reading. No, actually, the statistics don't support that. Logic does. I understand. That's what I'm referring to, essentially. Yes, logically, half the kids are above and half the kids are below. Except for one is right below average. Okay. What I'm trying to understand is the point that the school shouldn't have waited for you to get the Sam's report. The school shouldn't have waited for you slash lab school to get all this information. It should have been doing all of this stuff on its own. Is that the problem? Based upon how she was performing, based upon expression of parental concerns, yes. I'm sorry, based upon its obligation under child law. It can't be expression of parental concerns, so we're going to have that. No, throughout the year, not at the IEP. I don't need to make that point at the IEP meeting. That's right. What is the test? You say you've been doing this a lot. So what is our test for? Because I get the fact that you had parents who just, you know, didn't know. Neither child was having problems but didn't have the knowledge or wherewithal or resources to get their own testing. The school under IDEA is supposed to take the initiative here. But what is the legal rule that says responding to the Sam's report, putting these things in place, parents seem hunky-dory as far as we can tell with this, and then we're going to revisit it in 30 days. It's not enough. What put them on notice that they needed, at least over the summer, maybe they didn't have time, they wanted to respond quickly to Sam's report. But over the summer, they should have been getting more testing, doing the stuff that the lab school did that fall. So I think that's what you have to show is that they should have done in the summer what the lab school did in the fall so you had an IEP in place for fourth grade. That gets us back to the first question about NQS. Because under NQS, what the standard is is that the school system has to draft, consistent with the unique circumstances of each child, an IEP that should show a level of progress that the IEP team itself is supposed to establish is appropriate. That's a very general standard. And what I'm asking for you is if we as a court have to, we invite a rule, you know, to rule for you. It has to be something that DC can understand what its obligations are under the statute, or parents can understand what has to be shown before they have a right to go make this decision to go off to private school. So what more specifically, don't quote me, just the loose language. What specifically is the test, the trigger here that says you should have given me in 2014, we'll give you through the summer of 2014, what lab school did that fall, as opposed to responding to the SONS report, giving us your best views. That seems to be the issue here. I do have to pull the SONS report into it just in one way. If there is a lack of progress, and the sections I just cited, just in the area of reading, I guess, and we haven't talked at all about behavior. There hasn't been a lack of progress under what? Well, one of the marking periods in reading, and that her original eligibility was based upon language arts, including reading. Did you have a diagnosed disability in reading? I believe. I didn't think that was counted. Specifically in reading, no. Is that important? I'm sorry? Is that important? No, because the coding, of course, doesn't determine what appropriate programming is. If we are to believe Dr. Sarah Glenn, I know you didn't want me to go back to her, but believe Dr. Sand, what she said is that I identified lots of needs that the IEP shouldn't have addressed that weren't addressed with paraphrasing, obviously. But we're going through them, and the difficulty, I think, is back to the question of what's the standard that is supported by the IDEA? And we know two things. We know that it needs to be a free and appropriate public education, and under Andrew, that requires that the student, I'm going to misquote it, but, you know, make reasonable progress. Yeah, I'm misquoting that. But we also know that the IEP need not perfectly account for the student's needs. It need not do everything conceivable. And these parents, to their credit, may not be happy with doing less than everything that could perfectly account for their daughter's needs, and there may indeed in the real world be a lawfully permissible gap between what a school like the lab school can provide and what students are entitled to in the D.C. public schools. And then the question is, what measures that? And or what makes that gap not permissible under the IDEA? Because it just isn't at the level that the school should provide. On this record, your Honor, what I would point you to is the testimony in the hearing, not just from Dr. Sands, but from Dr. Jennifer Durham at the lab school, the experts in special education who identified that gap. Because it is absolutely true that if the lab school is the best, and I don't know that it is, but it's one of the best, and if it's the best, then certainly all students aren't going to be entitled to getting the best. We know that from Raleigh, and we don't even know what the best is, so how could that be the standard? But what those experts identified at the hearing was that the IEP was missing about two-thirds of the necessary hours of special education. And now you're talking about the June 2014? I went through, I mean, you have your big picture legal arguments, but you also do make arguments about these particular educational buckets. And my reading of the record came out a little bit differently from the way you characterize it in terms of things like on the reading goals, maybe the record is disputed. On OT, Sands, of course, recommends that she receive an OT evaluation, and then she gets an OT evaluation with a short turnaround. They were willing to do it, and there wasn't any suggestion from the parents or other IEP team members that OT was warranted right away. So I don't see that as necessarily a shortfall. And then there's a functional behavioral assessment, behavioral intervention plan. There wasn't one. And, you know, there's a question whether that's a procedural or substantive violation. So you're sort of referring to if the record is clear that there was this significant shortfall, and I'm not sure it is that clear, and or what is your standard? As far as the two areas that you just focused on, there isn't a substantial shortfall, or at least there's an argument on OT and behavior, because those are the two evaluations that the school system did in the fall. And we note that in our brief. We argue that they should have been there before, because she had significant behavioral problems the year before. Right, but Dr. Sands had recommended and identified the behavioral problems, and they did have behavioral provisions in the IEP. It wasn't that they were ignoring it. And if they've identified the behavioral problems and they've got a proposal for addressing it, they don't have to go get a functional behavior assessment. No, no, and once again, I couldn't agree to that, because I think much, much more significant is the fact that what Dr. Sands says she was recommending is for all core academic courses, small groups, special education classes, and for the non, like what they call the specials or the other things, special education support, but possibly that could have been in what's called a co-taught model she testified to, which is, you know, special education support within general education classes. That's what she recommended, and she said she identified these areas of need in the IEP, and academics, I've gone through them already, and that's what Dr. Durham from the law school said as well. They aren't in the IEP. They aren't in the new IEP, the January IEP as well. The small group special education is not? Is that what you're saying? Well, it is for up to about, I think, 11 hours, about a third of her time. Two-thirds of her time would have been in general education classes with no special education support whatsoever. How small would the classes be in the public school? There's a lot of emphasis on she needs small classes. I didn't know you were thinking that that was an issue. They'd be equivalent to the law school classes. Actually, they would be classes from as few as one instruction. The public school ones? I'm not talking about the pull-out. I'm not talking about the standard class. The instruction could be one-to-one. They would be, generally speaking, five to ten. Five to ten students with a teacher and sometimes an aide. In an ordinary class, we're asking? In an ordinary class, 25 to 30, I think. And how about at lab? Lab schools vary because they have about 12, I think, a testimony of 12 or 13 in a class with a teacher and a couple of aides. And then they break the class up for academics, so it ends up to be about six with about three or sometimes even four staff. Very, very, very small intensive classes. But the point I was trying to make was that at least by the January IEP, the mid-year IEP with all of that input from labs and the new CCPS reports in OT and the SBA, the school system still proposed something that the experts testified would be insufficient, would be marginally insufficient to meet the students' needs. But the only objection you have there, let's add in the April executive functioning, but the only objections you had, at least in January, were the executive functioning and that it wasn't full-time special education. Is that correct? According to the testimony from Dr. Durham. No, I'm not asking about Dr. Durham. I'm asking about your objections. Is that the IEP meeting? To the January? Not in the meeting. The January 2017 meeting. At the meeting would be great. But your objections, what you say is deficient about January 2015 is it's not full-time special education and it didn't address executive functioning. Anything else? Yes. According to the testimony, the academic goals in math, reading. Any of that in your briefing. And where is that in your objections on the district? All I had gotten was the special education and the executive functioning. If I may. I'm getting a bucket. Did you define executive functioning? I think executive functioning is organization, initiation, the ability to execute that part of the brain. The term for all the social behavior, right? Executive functioning is basically the way I've always described it. Great athletes like a golfer on Sunday afternoon, maybe not being better, but being able to beat the other people. You can be organized and focused and understand the task and get it done. That's what executive functioning is. In the classroom, it's remembering your assignments. It's being able to shift from one thing to another. It's being able to attend. Attention deficit is related to executive functioning. The objections on the writing in math were that there were inappropriate goals. What are the objections to the services as much as the goals, right? The amount of services, because if you already give that amount of hours of special education, then you're not going to be able to deal with all the academic subjects. But besides that, it's the nature, the substance of the goals. So can you give me a concrete example? So the goal that lab school offered in math. One multiplication rather than two. Public school was math. According to Dr. Durham, the levels were very, I can find that slide too. The levels that some of the goals started at were very inconsistent with the ZB that they received and started working with. They were too high. They were too ambitious? Too ambitious. They saw it and presuming skills that she did not have. In 2015. The 2014-15. I'm talking about January 2015. Yes. 2015 IEP. Yes. The January 2015 IEP started her at too high a goal. Which areas? I'm trying to get some specifics from you because I had not gotten this kind of briefing. Other than that you want to get full-time special education. If I may, I will point you to that. Thank you very much. Maybe we should let the other side. I can't hear you.  I have a microphone. Go ahead. Thank you. Good morning. Richard Love. District of Columbia. Your honor, I respectfully disagree with many of the arguments. Particularly as to what the record shows about reading and what the record shows about the disagreement with regard to the January 2015 IEP. Which I'll start with. If you look at pages 397A to E, 398, 400 to 402, Ms. McClellan who was from McFarland testified she was responsible for preparing the January 2015 IEP. She testified as to how that came about. In December, based on the additional evaluations that DCPS obtained, they revised the IEP. Parents asked if they could reconvene and consider information from the lab school and their attorney, which the school system agreed to do. And at those pages that I referenced, Ms. McFarland testified that all of that information was included. That there was no disagreement about goals. And that the only disagreement with regard to the 2015 IEP was as to the need for full-time special education. There was executive functioning goals in the January IEP. They weren't an express goal. They were included in a different area. Where were they included in January? In January, I think they said they were in the social area. But there clearly were the executive functioning goals with regard to organizational and color-coded materials. What was added in April was a result of a resolution being in this clear testimony in the record that says that that wasn't brought up for us. And that's why they added it in April. But what was provided in January was what had been obtained from the lab school or was designed to address what was obtained from the lab school and see if these parents and the other data and information to address the executive functioning. With regard to the disagreement on special education, whether it was required for full-time, there is abundant evidence in the record. That explains why the members of the DCPS IEP team disagreed that there was a need for full-time special education. And the hearing officer and the district court on an independent review credited that. For example... The district court didn't just credit it. It seemed to give a rule of deference. Are you defending that rule of deference that the district court did? Well, I... I understand... Explanations are there or not from the district. You don't get deference. Well, I think that what the district court said was she gave less deference to the hearing officer's finding than that she did her own independent review. And I think the result of that independent review was basically a basic corroboration of the findings and conclusions that the hearing officer reached. What I'd like to do, if you don't mind, is get back to June 2014. Yes. Okay? The Dr. Sands report comes in in April. It was a pretty short order before the June 2014... It was received on May 19th. May 19th. It was dated May 12th, but I believe it was ticked that she received it on May 19th. Okay. So in pretty short order, the district to its credit looked it over and got an IEP within a couple weeks on that. But what is... The district has an obligation on its own to discover... When you identify a child who has needs, and this child has been demonstrating needs for years within the D.C. public school system. You already had a 504 plan in place. This has been going on since pre-K. So what was the obligation? What's the legal rule that you would offer for why the district itself didn't have an obligation, at least over that summer, to do more testing and get more information? It seems to be very reactive, right? It doesn't do this testing. It waits for them to go get a private test and give it to you and go, oh, okay, that's good. We'll do this. And then wait for labs. You say, don't go to lab school. But all the district has done here is react to what the lab school did and what the studies there produced. Where is the district here meeting its own obligation to exercise initiative? We can't depend on parents. Some parents might not have the wherewithal to know themselves what to do. They're just trying to help their child. So where is the district being proactive here in getting testing done for a child that seems to have a lot of real challenges? Well, I think the evidence in the record does show that since the middle of the second grade at Harris, ZB was receiving behavioral support. Behavior was identified as an important consideration. Behavioral support is not the same thing as an IEP and educational plan. No, but, you know, there was testimony in terms of tiered levels that were provided to, you know, they stepped up their intervention. Well, I guess the district has its tiers it wants people to march through. But if you have a child who you can tell early on, again, you've had her since pre-K, she's got some real issues. I don't know why you have to march through tiers when you know she's already a tier 3 or tier 4 person. Well, I respectfully disagree. I mean, based on the record, the information in the record, I mean, ZB's own therapist from Children's Hospital recommends a 504 plan. And she says that should be tried first. And if that doesn't work, then perhaps IEP. But, again, there's the parents going to get the information, right? The parents seem here to have to keep getting the tests and then delivering them to you. Not all parents can afford to get these tests done. You have child find obligations. You have identification obligations. And all the district seems to be doing here is reacting to the tests that they're going and getting and paying for. And that can't be right. I mean, you argue that they just have to have an IEP that fits the evidence in the record. But if the district isn't going to get any evidence from the record on its own, that seems to be an enormous problem. That can't be the test anymore. So tell me what the rule is for what testing and information you have to collect and how it was met here. Well, I think it was met by the information that the parents did procure. So is your position that the district had no obligation with the student that it seems struggling since pre-K to get any information on its own? It just had to wait for parents to bring tests? No. Okay, so then what was that? I'm saying that the record shows that they did. They provide tiered interventions in second grade, both in behavioral, pull-out, special education. You said that was in response to the report from their doctor and children. No. If you look at the record at pages, I think it's referenced at pages 55, 254, and 340, before there was a 504 plan, ZB was receiving behavioral support and pull-out small group instruction, and I believe math and I also believe in reading. Later that year, a 504 plan was initiated. Which grade was that? And it was initiated in response to the therapist's recommendation. Which grade was that? Excuse me? Which grade was the 504 plan? Was that second grade? It was in the second grade, but it was after the behavioral support and the pull-out services were already being provided to ZB. There were also, I think, some... So the 504 plan, you do your tier with that, and then the change is prompted by their report from their doctor, and then after that, what did you do? Or did you not have an obligation? I'm really trying to understand the legal rules here because the Supreme Court standard is very amorphous. And so if you agree that the district has an obligation on its own to identify problems, to do needed tests, to create an appropriate record for making these judgments, what is the test for that? How would you articulate the legal rule you'd like to see in an opinion, and how was it met here? My understanding also, I mean, there are additional things that the DCPS did, I think, before the June 14th IEP. There's evidence in the record, I believe, at 125 and 127 that HRST was providing a bullying curriculum, preferential seating, extended testing time, and a multi-sensory learning and repetition during instruction. But more responsive to your question, I think the idea requires if the parents had requested independent testing, there would be an obligation... What if parents don't know to request? Then you don't have to do anything? I think, you know, I'm not aware of any requirement I'm not familiar with. I am familiar that if the request is there, testing has to be done. So if the district... No, no, I want to be crystal clear on the district's position here. Is it that you have only to respond to parental requests, reports obtained by parents, and you don't have an independent obligation when you see a child struggling and she was going nowhere and taking grades but down? And so where you have no obligation to do the testing or collect the information on your own. I just want to be clear where the district's position is. Well, my position, based on this record, is that the district did respond to what they were... Okay, that's not the question I'm asking. I'm asking what your position... You guys are the ones that send in a contract to the federal government saying we're going to comply with the IDEA. We're going to comply with all of its obligations, including child's time obligations. Do you understand as part of those obligations that you have a duty when you discover a child that's struggling to obtain testing or not? I'm just asking a question. Well, but your question asked when is that obligation triggered? My question is right now is do you have an... No, I have one question at a time. The question right now is do you have any independent obligation to undertake testing or consult experts, collect information on which to advance the IDEA? Okay, you do have that obligation. I think, you know, that obligation exists. When it is triggered... When is it triggered? I can't answer that specifically. I think it's fact dependent. Here you had a school psychologist who identified and provided the behavioral implementation plan as early as second grade. Did the school psychologist do that on either her own or was it in response to complaints from the parents? No, as far as I read the record, this was initiated by DCPS, by Ms. Tick. She testified later she developed a 504 plan. So there were some services provided, and I think if you look at the DP's father's testimony, I think he also indicated there were these various tiers. Okay, so beyond 504, which is a different statutory scheme, you have obligations under the IDEA, which involves IEPs. So why didn't the district believe that it had, at any time, an obligation to test this child or to get experts to come in, you know, either testing or expert evaluation? This was a child that needed an IEP under the IDEA. Was that ever decided by DC? Well, it was decided after, you know, these other efforts. Wait, what other efforts? Well, as I said, there was a behavioral implementation plan that was pulled out in reading and math. Subsequently, then there was an escalation of 504 plan. Right. And thereafter, the IEP was developed subsequent to this report. Okay, so I'm back to my question. When did DC – so did DC didn't decide that she needed an IEP until the parents went and got a test? You didn't feel any obligation to get her tested on your own or to decide on your own that we are now – we now need an IEP governed by the – I'm sorry, how do you acronym I-D-E-A? Apparently not. There's not in the record any indication that, you know, that IEP testing or was conducted or requested prior to the sales report. Right. There also was testimony, at least from Ms. Pitt, Ms. Pitt, and I didn't note the page, but I know it is in the record, that, you know, there was a concern on the part of DB's parents about labeling her as special education and that they did want to go through this tiered system before coming to that point. So there was, as I said, there were services, and the initiating factor was, as you said, in this particular case, the SANS report. You guys made – I mean, there's important arguments here that you make about, look, when we got the information, we did a very prompt response to the SANS report. We had these measures in here that we thought would implement that enough to give her an appropriate education. The parents didn't seem to object. We were going to review in 30 days, and then off they go to lab school. So I guess that sounds like a powerful argument, but then when you look at the big picture here, D.C. has done nothing except react. You say don't go to lab school, but it's only because they went to lab school and got the information on the testing that you got the January 2015 IEP. How would that have ever come into being without them? If they hadn't gone to Dr. SANS, if they hadn't gone to lab school and gotten these testing and reports, how would we have ever gotten to a point where you now say we have what the law requires? Well, I don't think you can answer that. I mean, they might have done it, you know, without the SANS report. They might have done it, you know, in the end of the third year. They may have done it in the first grade. We don't know one way or the other. Does D.C. not have a system in place for undertaking testing? 504 plan wouldn't get an IEP. Certainly they do, but, you know, what triggers it? I mean, I think it's very factual dependent on this particular instance. Why wasn't it triggered here before the SANS report in May? Third grade had not been going great. Second grade hadn't been going well at all. Well, services were being provided in second grade and they were following the therapist's recommendation and first implementing a 504 plan before moving to IEP testing. Why it wasn't done before April, which is when Dr. SANS conducted her evaluation and her report was issued the following month, I'm not certain. The record doesn't indicate it, just as it doesn't indicate whether or not it would have been done the following week, month, or the following school year. So it may never have happened. But they were. If they hadn't done it on their own. Well, I don't think you can conclude that. We can't conclude either way is what you're telling me. That's correct. It's problematic, given your obligations under the statute. It's hard to say don't go out and exercise your own initiative to find out what your child needs. You can't do that. And yet all the school does is react to incorporate what that initiative produces. That's just what I'm struggling with in the law. It seems like there needs to be a legal rule about what triggers it, what you have to do, what triggers it, and then we'll be able to know when they have gone too far. Not too far, but they've made their own independent decision to go another way. I think the legal rule is, the question is whether or not she was provided a FAPE through the June 2014 IEP and the January 2015 IEP. Both the hearing officers and the district court concluded that she did. Do you think the 504 plan itself would satisfy the IDEA standards for an IEP? No, I'm not suggesting that. Okay, just to be clear. Because you want us to only look at that, but obviously their decision in June 2014 or spring 2014 to apply a lab and in August 2014 was a product of all the years that are talked about in the record that led up to that. All those years of them having to go get the specialists, the children, them having to go find Dr. Sands. The things that the district were doing were just not remotely. Things were getting worse. The bullying was getting worse in her learning. As you get older, these impacts become much more consequential. We can't just look at June 2014. We have to look at the whole record in the DC school system. I agree, and I think the record shows it wasn't total reliance on the Sands report. There also were the people who were participating in the June IEP meeting included school personnel who had been working with ZB since second grade. Are there any plans to have a June 2014 IEP had the Sands report not landed in someone's office in May? Is there any evidence in the record that the school district itself was already formulating an IEP? No. It was just carrying forward the 504 plan at that point. Yes, they were carrying forward the 504 plan, and as I said, there were, as Dr. Sands in her report notes, ZB, this is from her May 14th report. She notes ZB has improved a great deal this semester. Her fluency and problem-solving skills have come a long way. ZB's reading improved significantly, and Dr. Sands' testing in her report showed that she had average reading skills. ZB's third report. Well, you told me the 504 plan you had in place was not sufficient, so the fact that there may have been nowhere to go but up at that point for this child. So I'm not sure. I'm saying the 504 plan doesn't substitute for IEP testing, but, you know, Dr. Sands' report shows that there were, you know, there were issues, but there also were significant strengths. Is there anything in the record about what DC was doing on its own testing and monitoring to say that this was good enough? I imagine there was no Sands' report. That's what I'm asking. Is there anything in the record to say that there would have been a recognition for all the additional things that showed up in June 2014? There's nothing that indicates one way or the other whether or not IEP testing was contemplated, but as I said, personnel from our school were providing services to ZB since the second grade. Some of those services were escalated over the course of the second grade and the third grade, so this wasn't a student who was simply shut off to the side and neglected and overlooked. There were services. There was attention. They were aware of ZB's problems. That sounds like the problem with Dr. Sands' report, but this is not simply a situation where her school simply overlooked ZB. No, I get that. You didn't completely miss the ball on this, and to be fair, Andrew F. was not on the book. You all were working in a Rowley world, but what you just described sounds like exactly the Minimus Progress standard that was rejected in Andrew F., and so what I'm wondering is this whole case is litigated pre-Andrew F., and to be fair to this, right, you didn't have Andrew F. on the book, but how do we have a record here to know that the district was independently meeting its obligations consistent with the Andrew F. standards? If no one ever applied it. I think the standard this court has to judge is whether or not the June 2014 IEP provided ZB a free and appropriate public education, and the fact that it was initiated by Dr. Sands' report doesn't take away from what the issue before this court is. Let me ask you another question about June 2014 IEP. If you had all the information that you had in January 2015, would the June 2014 IEP? The only difference between the June 2014 IEP and the January 2015 IEP is reading was added as a gulf. Now, when the June 2014 IEP was developed, and there's considerable testimony in the record from Ms. Peck and Ms. Oliveros who disagreed that reading was required or necessary. You have, as I said, Dr. Sands' report. I want to get back to my question, which I think is a simpler one, and that is if you had the information that you had as of January 2015, if you had that in June 2014, would the June 2014 IEP have been appropriate under the IDEA? Would it have met the Andrew F. Standard? If you had that information. I guess you didn't, but if you had, would it have met the Andrew F. Standard? I want to answer the question, but I want to make sure I understand it, so I'm answering it first. If you take all the information, the IEPs are formulated on the basis of the information in front of you. If you take all the information you had in January 2015, when you made the January 2015 IEP, and all you produced instead was the June 2014 IEP, would you have met your obligations under the statute? Well, I certainly, yes. I think that the only, as I said, the only difference in the January 2015. The only difference in reading can be all the difference in the world, if that's something she needs to have addressed. But there was a basis for not including it. No, I'm saying you have the information in January. By January, you had the information about reading problems, and that's presumably why you put it in your January 2015 IEP. I think you want to say June was fine because we didn't have that information, but I think what I'm getting is that once we had the information we had in January, we responded as we did, quite responsibly, and we changed the IEP to reflect this new information we had. We had an abundance of information in front of us, and we were quick to, this isn't a delay case, we were quick to respond. We've essentially given them everything but full-time special education based on the information that we've gotten. Right. And we didn't have that information in June. Right. So it didn't have the stuff that we knew we needed by January 2015. Right. If we had that information. But the information, we couldn't have had the information that we had in January because we had six months or several more months of experience inside a classroom setting with ZB with regard to reading skills. We also had an occupational therapy evaluation that had not been conducted. I mean, as you said, we received Dr. Sands' report on May 19th. The priority was to not wait for an OT eval, but to complete an IEP, and that was done promptly. You did it promptly, and then you had a whole summer where you did nothing. No summer education, which can be very important. I've never been found to need extended school year. Okay. We did it by the last school. No testing, none of the stuff. No, there was no testing. And as you had pointed out, the parents did agree. I mean, all of the people working said we would agree with the goals, objectives, services, and the hours in the June 2014 IEP. There was an understanding that it would be reviewed in 30 days and could be changed at that point. So, yeah, there was nothing done over the summer. The understanding was that it would be reviewed in 30 school days and adjusted as needed at that time. I know, but you loved it. I'm taking you over this territory in depth. In terms of the testing in the, I think it's in the functional behavioral assessment by Ms. Hughes in the record, she's narrating the background, and one of the things that she says is that when there was an improvement, the school refused to test Zoe. As a result, Mr. and Mrs. Brown procured an independent evaluation, and that's in the appendix at page 129, although the big stamp printing says 224, but I think the page number that you're using in this corrected appendix is 129. It's that tiny, tiny writing in this SBA, and it does come across as sort of narrating things from the Brown's perspective, but it's also a DCPS document. I just wondered if you have any information about that. My understanding is that that was according to Zippy's parents. There's no testimony or other record evidence that confirms their allegation that testing was refused, but I think that's reporting what Zippy's parents reported to Ms. Hughes. So there's nothing one way or the other other than this? Other than that allegation from Zippy's parents in this document, and I believe there's some reference to that in Zippy's father's testimony in the record as well, but there's nothing to corroborate that. There's nothing, and I think the – I mean, I understand the court's point with regard to the district reacting or being in a reactive mode, but they reacted promptly each and every time. It's not consistent with a refusal, and I think when information was brought to them, they reacted promptly, responsibly, and appropriately, and I think the issue with regard to mainstreaming Zippy is a very important issue, and there's considerable evidence, as I said, that supports the conclusion that she didn't require full-time special education. As a number of her teachers testified, she says, Zippy could interact and would benefit from interaction with her non-disabled peers, interactions that the lab school can't provide. Zippy shouldn't have been isolated. She needed to have contact with the students. Not all of them were bullying her. A lot were trying to befriend her, and at DCPS, Zippy was getting the dual support system with special ed as well as the general ed classroom. All right. Thank you very much. Time is well over. Thank you. Thank you. All right. I'm sorry. I agree. Sorry. We'll give you three minutes. We'll give you three minutes. Thank you very much. I want to pick up on Dr. Stanton's report again because in May it was submitted. I absolutely agree that the school system, the team at Hearst turned it around very quickly, but they completely missed the explicit recommendations in the report, and I believe it's doing appendix 58, but once again, I do ask for permission if I can, beyond today, to fix up my citations from oral arguments. Or if you just want to send a letter in. Thank you very much. I'm pretty impressed. But it's page five of her report. That much I know. On the top. And her recommendation is very clear. It says, and she testified to this as well, with respect to placement, Zoe should receive specialized small group instruction for core subjects. Which paragraph are you in? Right on the recommendations on the top. That's not on her page four. Page five. I'm sorry. Okay. And the recommendation is towards the bottom, about five lines from the bottom. With respect to placement, Zoe should receive specialized small group instruction for core subjects, e.g., math, language, arts. For other subjects, Zoe should be placed in a classroom with a small teacher-to-student ratio and increased support for her symptoms of ADHD and to accommodate for the impact of her learning disorders in the settings. For example, co-taught classes. That's what Dr. Sands repeated that, of course, in her testimony. What the school system, what the team at Hearst did in response to that in the June 2014 IEP, the next month, was it proposed seven and a half hours of special education a week. Or an hour and a half a day. And it's wholly inconsistent with what she recommended. Yes, the parent did not say at the IEP meeting what I reviewed, Mr. Zippy's father's testimony. And what he said is that we didn't think, I didn't think it was appropriate, but I didn't say it at the meeting. I went back and talked to my wife. I talked to Dr. Sands. That's when they applied to the lab school according to his testimony. So it was a little bit later than I said it was. In fact, because they didn't think it was consistent with their recommendations, they didn't tell the school system until the end of August, as we well know. That's exactly what happened. But that IEP in June of 2014 was wholly inconsistent with what was being recommended and what the school system didn't do, in addition to not following it in the June IEP meeting, to do anything that was just noted over the summer to say we should have Ms. Tick evaluate this student or we should have Ms. Oliveira evaluate this student because that recommendation is not what's in our IEP. It clearly isn't. So that's one thing I wanted to point out. I think we've gone very, very long, I won't argue, a very, very long time. And thank you very much. The case is submitted. Thank you.
judges: Millett, Pillard, Williams